# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MISTY MURRAY AND SHAUN MURRAY, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | No.   12-cv-04789 |
| v. | ) ) | Hon. Sara L. Ellis |
| BILL ME LATER, INC., a Delaware corporation, | ) ) | |
| *Defendant*. | ) | |

## PLAINTIFFS' UNOPPOSED MOTION & MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Myles McGuire
mmcguire@mcgpc.com
Evan M. Meyers
emeyers@mcgpc.com
**MCGUIRE LAW, P.C.**
161 N. Clark Street, 47th Floor
Chicago, IL 60601
Tel: (312) 216-5179

Michael J. McMorrow
mike@mjmcmorrow.com
**MCMORROW LAW, P.C.**
One North LaSalle St., 44th Floor
Chicago, IL 60604
Tel:  (312) 265-0708

*Counsel for Plaintiffs and the Class*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................2

    A.  Unauthorized Robocalls to the Class Representatives and
        Commencement of this Class Action Suit .........................................................2

    B.  The Class Representatives' Discovery Efforts ..................................................3

    C.  Settlement Negotiations with Hon. Edward A. Infante ....................................4

    D.  The Settlement Agreement ...............................................................................5

III. THE PRELIMINARILY-APPROVED SETTLEMENT ............................................6

    A.  The Settlement Class.........................................................................................6

    B.  The Settlement Fund .........................................................................................7

    C.  Notice and Settlement Administration..............................................................8

    D.  Opt-Out and Objection Procedures .................................................................10

    E.  Release ............................................................................................................10

IV.  THE SETTLEMENT WARRANTS FINAL APPROVAL .......................................11

    A.  All Factors Favor Final Approval ..................................................................13

        i.   *The Settlement Provides Significant Benefits to the Settlement
            Class, Particularly Given the Uncertain Outcome of a Litigated
            Resolution* ............................................................................................13

        ii.  *This Multi-Year Litigation has Already Involved Complex and
            Expensive Discovery on Novel and Uncertain Legal Issues*................15

        iii. *The Unqualified Support of the Settlement Class Demonstrates the
            Benefit of the Settlement and Supports Final Approval*......................17

        iv.  *Experienced Class Counsel Believes the Settlement is Fair,
            Reasonable and Adequate*....................................................................18

        v.   *The Extensive Discovery and Advanced Stage of the Proceedings
            Weigh in Favor of Approval* ...............................................................19

B. The Executed Notice Program Comports with Due Process and the Requirements of Fed R. Civ. P. 23 ................................................................21

V.     THE UNOPPOSED ATTORNEY FEE AND INCENTIVE AWARDS SHOULD BE APPROVED ..............................................................................23

VI.    CONCLUSION .............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agne v. Papa John's Int'l, Inc.*,
    C10-1139-JCC, 2012 WL 5473719 (W.D. Wash. Nov. 9, 2012)...........................................14

*Am. Civil Liberties Union v. United States Gen. Servs. Admin.*,
    235 F. Supp. 2d 816 (N.D. Ill. 2002) ......................................................................................17

*Am. Int'l Grp., Inc. et al., v. ACE INA Holdings, et al.*,
    Nos. 07-cv-2898, 09 C 2026, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012)..............................13

*In re AT&T Mobility Wireless Data Services Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010).........................................................................................11, 13

*Bryan v. Pittsburgh Plate Glass Co.*,
    494 F.2d 799 (3d Cir. 1974), *cert. denied,* 419 U.S. 900 (1974)............................................17

*Burns v. Elrod*,
    757 F.2d 151 (7th Cir. 1985) ...................................................................................................21

*Desai et al v. ADT Security Services, Inc.*,
    No. 11-cv-1925 (N.D. Ill. 2013) ..............................................................................................20

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ...................................................................................................11

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974). Notice ....................................................................................................21

*Gardner v. GC Services, LP*
    10-CV-0997-IEG CAB 2012 WL 1119534, *4 (S.D. Cal. Apr. 2, 2012) ...............................16

*Garner v. State Farm Mut. Auto. Ins. Co.*,
    CV-08-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)....................................................18

*Griffith v. Consumer Portfolio Serv., Inc.*,
    838 F. Supp. 2d 723 (N.D. Ill. 2011) ......................................................................................14

*Hammon v. Barry*,
    752 F. Supp. 1087 (D.D.C. 1990) ...........................................................................................17

*Hispanics United v. Vill. of Addison*,
    988 F. Supp. 1130 (N.D. Ill. 1997) .........................................................................................18

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) .......................................................................... *passim*

*Laskey v. International Union (UAW)*,
  638 F.2d 954 (6th Cir.1981) ..................................................................................17

*Lipuma v. Am. Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) ...........................................................13, 15

*Lozano et al v. Twentieth Century Fox Film Corp.*
  09-cv-06344 (N.D. Ill. 2011) ................................................................................20

*Mangone v. First USA Bank*,
  206 F.R.D. 222 (S.D. Ill. 2001) ......................................................................19, 21

*Mars Steel Corp. v. Cont'l Ill. Nat'l. Bank & Trust Co. of Chicago*,
  834 F. 2d 677 (7th Cir. 1987) ..............................................................................11

*In re Mexico Money Transfer Litig.*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) .............................................................16, 17

*Mirfasihi v. Fleet Mortg. Corp.*,
  356 F.3d 781 (7th Cir. 2004) ...............................................................................23

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950). Notice ................................................................................22

*Protective Comm. for Indep. Stockholders v. Anderson*,
  390 U.S. 414 (1968)..............................................................................................13

*Rojas et al v. Career Education Corp.*,
  No. 10-cv-05260 (N.D. Ill. 2012) .........................................................................20

*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*,
  271 F.R.D. 139 (N.D. Ill. 2010)............................................................................23

*Smith v. Microsoft Corp.*,
  297 F.R.D. 464 (S.D. Cal. 2014) .........................................................................14

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
  463 F.3d 646 (7th Cir. 2006) ...................................................................12, 13, 20

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
  309 F.3d 978 (7th Cir. 2002) ...............................................................................11

**Statutes**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

47 U.S.C. § 227(b)(3)(B) ............................................................................................14

28 U.S.C. § 1715 ..............................................................................................18, 23

**Other Authorities**

A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed.), § 11.41 ......................................17

A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed.), § 11.42 ......................................11

A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed.), § 11:53 ......................................21

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
27 F.C.C.R. 1830 (2012) ..............................................................................................14

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) ..............................................................................21

## I.     INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Class Representatives Misty Murray and Shaun Murray ("Plaintiffs" or "Class Representatives"), through Class Counsel, respectfully submit this motion for final approval of the proposed Settlement of this class action, as set forth in the Settlement Agreement and Release (the "Settlement" or the "Settlement Agreement")[1] dated July 21, 2014.  (Dkt. 69-1.)

The Settlement achieved by the Class Representatives and Class Counsel in this matter has been met with unqualified approval by the Settlement Class Members.  To date, over 41,000 Settlement Class Members have already submitted claims, with over a month remaining in which Settlement Class Members may submit claims.  Not a single Settlement Class Member objected to the Settlement or voiced any opposition.  Only 33 consumers opted out of the Settlement.

The positive reaction from the Settlement Class is not surprising; the Settlement produced an excellent result for the Settlement Class.  The Settlement makes available a $9,900,000.00 Settlement Fund, which will not revert to the Defendant in any circumstance, and which will be paid out in its entirety to satisfy the valid claims of the Settlement Class Members, along with the costs of administration, attorneys' fees and expenses, and Incentive Awards to reward the Class Representatives for their efforts in obtaining this strong result for the Settlement Class.

The Settlement is fair, adequate and reasonable.  It has been overwhelmingly approved by the Settlement Class Members and will result in significant cash recoveries to each Settlement Class Member.  As a result, this Court should grant final approval to the Settlement, and also

---

[1] Unless otherwise indicated, all terms capitalized and otherwise undefined herein will have the meanings assigned in the Settlement Agreement, which is attached hereto as **Exhibit A**.

approve the request for attorneys' fees, expenses and Incentive Awards previously requested in the October 6, 2014 motion filed by the Class Representatives and Class Counsel. (Dkt. 75.)

## II. BACKGROUND

### A. Unauthorized Robocalls to the Class Representatives and Commencement of this Class Action Suit

Defendant Bill Me Later is a nationwide purveyor of consumer credit for merchandise purchased online and over the phone. Bill Me Later allows consumers who want to make purchases online to make such purchases without a credit or debit card, and instead finance the payment of their purchases over several months. While Bill Me Later does not directly fund the loans – the loans are funded by its banking partners, including CIT Bank, WebBank, and Comenity Capital Bank – it processes the applications, administers the accounts for their duration, and engages in collection activity including placing automated collection calls to debtors.

As part of its application practice, Bill Me Later receives phone numbers from its customers, the predominant purpose of which is to call those customers if their accounts go into arrears. Unfortunately, the sheer size of Bill Me Later's business, coupled with the high risk of default of its customers along with periodic phone number inputting errors during the application process, have led Bill Me Later to repeatedly call consumers who are not its customers and to continue calling many of those non-customers long after they inform Bill Me Later of its error.

The Class Representatives, Misty Murray any Shaun Murray, claimed that, beginning on March 17, 2012, Bill Me Later started calling them, attempting to collect a debt from an individual named Faiza Tahir, a Bill Me Later customer. The Class Representatives tried repeatedly to get the calls to stop, but despite their requests, the calls continued unimpeded. Between March 17 and May 16, 2012, the Class Representatives allege that Bill Me Later called them 126 times, despite the fact that neither Class Representative has ever been a Bill Me Later customer.

On June 15, 2012, Plaintiffs filed a Class Action Complaint against Bill Me Later in this Court. Contemporaneously with the Complaint, Plaintiffs filed their Motion for Class Certification. Plaintiffs alleged that the autodialing technology used to call them constituted an "automatic telephone dialing system," that the calls were made using an artificial or prerecorded voice, and that they never provided Bill Me Later with their express consent to receive such calls.

### B. The Class Representatives' Discovery Efforts

The Parties engaged in extensive discovery, including numerous depositions, document requests, interrogatories, and the production of thousands of documents by Bill Me Later and its agents, including third-party CSG International, Inc. ("CSG"). Plaintiffs took the depositions of three separate Bill Me Later employees in July 2013, and Bill Me Later took the depositions of both Class Representatives later in the summer of 2013. In addition, Plaintiffs subpoenaed and reviewed phone records of several years' of automated phone calls, covering millions of calls, from CSG, Bill Me Later's agent for the placing of automated debt collection calls. Plaintiffs also noticed the 30(b)(6) deposition of CSG but agreed to withdraw the Subpoena pending the outcome of the mediation that resulted in the instant Settlement. Class discovery was initially scheduled to be completed in June 2013, but, pursuant to agreement of the Parties, the Court permitted discovery to continue through October 10, 2013.

During discovery, Plaintiffs learned that Bill Me Later "invalidated" certain numbers that it believed were not accurate and/or that should not be sent additional automated collections calls. Bill Me Later produced a list of all such invalidated numbers, which included approximately one million numbers from June 2008 through 2012. This list identified the telephone number that was invalidated, the date of invalidation, and whether the number was subsequently re-validated. In response to a Subpoena in this case, Bill Me Later's agent CSG produced call detail records for all calls made by CSG on Bill Me Later's behalf between June 15, 2008 and December 31, 2012.

These call detail records identified millions of automated calls, including the telephone number called, the date and time of the call, the call result, and an assigned call result "code." Some of those codes are explained in a "call flow and scripting" guideline produced in this case and explained by CSG during the discovery process.

During CSG's automated calls, the recipient of the call could indicate that the Bill Me Later customer did not live at that address – i.e., that the call was being made to a wrong number. If the call recipient indicated a wrong number and then hung up the call, CSG's system would record a particular code to indicate that the wrong number was called. An analysis of the call detail records produced in this case for all Bill Me Later calls made from June 2008 through 2012 revealed the unique phone numbers where the "wrong number" code was entered through CSG's system. Plaintiffs planned to move for class certification of a narrow class consisting of only those consumers whose phone numbers appeared on both Bill Me Later's invalidated number list and also on CSG's records as indicating that a "wrong number" code had been entered by the call recipient. Bill Me Later contended that the Plaintiffs' proposed class would not be certified for several reasons, including its arguments that it invalidated phone numbers for a number of reasons, not limited to the phone numbers being incorrect, and that call recipients falsely indicated wrong numbers on CSG's automated system.

## C.      Settlement Negotiations with Hon. Edward A. Infante

As the deadline to complete class discovery approached, and with the Class Representatives' class certification motion forthcoming, the Parties began to explore settlement. At the close of class certification discovery, with discovery disputes still lingering both among the Parties and third-parties, the Parties agreed to mediate to determine if a settlement could be reached in advance of the uncertainties and high risks of the class certification decision. On January 28, 2014, counsel for the Class Representatives met with both in-house and outside counsel for

Defendant and its corporate parent eBay, Inc. in two full-day mediation sessions at JAMS in San Francisco, California with the Hon. Edward A. Infante (ret.), a former Chief Magistrate Judge of the United States District Court for the Northern District of California with expertise in TCPA class settlements. The Parties were unable to reach an agreement at the mediation. However, upon recommendation of Judge Infante, the Parties agreed to meet again for a second full-day mediation session, and did so in San Francisco on March 13, 2014. At the second mediation session, the Parties reached an agreement in principle to resolve the case. In the interim between these formal sessions, and in the months that followed, counsel for the Class Representatives and for Defendant, together with assistance and guidance from Judge Infante, successfully resolved all elements of the settlement. Eventually, these extended discussions culminated in the Settlement Agreement that this Court approved on July 24, 2014.

### D. The Settlement Agreement

The result of the Parties' negotiations and Judge Infante's influence is a Settlement that is of tremendous benefit to the Settlement Class Members, along with voluntary changes to Bill Me Later's practices that significantly reduce further intrusions on the privacy of consumers and the public generally. The Settlement established a $9,900,000.00 cash Settlement Fund. (Ex. A, § 1.41.) Each Settlement Class Member who submits a valid Claim Form will be entitled to an equal share of the Settlement Fund, up to the full $500 statutory amount available under the TCPA, after payments are made for notice and administration costs, Court-approved attorneys' fees and expenses, and approved incentive payments to the Class Representatives. (*Id*. § 3.2.)

The total payment to each Settlement Class Member will depend on the number of valid Claim Forms submitted. Direct Notice was provided by First-Class Mail to approximately 308,807

consumers, and notice was provided by email to an additional approximately 34,256 consumers.[2]
(*See* Declaration of Jeanne C. Finegan, attached hereto as **<u>Exhibit B</u>**, ¶¶ 21-22.)  As of the date of
this filing, 41,865 Claim Forms have been received by the Settlement Administrator (*see*
Declaration of Michael J. McMorrow, attached hereto as **<u>Exhibit C</u>**, ¶ 16), which makes it highly
likely that the <u>entire</u> Settlement Fund, net of attorneys' fees, administrative expenses and incentive
awards, will be distributed to the Settlement Class Members directly.

## III.    THE PRELIMINARILY-APPROVED SETTLEMENT

### A.    The Settlement Class

The Settlement and the Preliminary Approval Order have established a Settlement Class

for this matter defined as follows:

> All persons who from June 15, 2008 through July 24, 2014, (a) received a call on
> their cellular phone from or on behalf of Bill Me Later, Inc. (BML) using an
> automated telephone dialing system and the called party did not give consent for
> BML to make such a call, or (b) received a call on their cellular phone or residential
> telephone line from or on behalf of BML using an artificial or prerecorded voice to
> deliver a message and the called party did not give consent for BML to make such
> a call.

(Ex. A, ¶ 2.1.)  Upon preliminary approval of the Settlement, the Settlement Administrator, using

the reverse lookup process specified in Section 2.7 of the Settlement Agreement, identified

308,807 unique individuals whose phone numbers appeared in the BML Records Results, but

whose names did not match the names identified in the Reverse Lookup Results.  (Ex. B., ¶ 20.)

The Settlement Administrator mailed a Claim Form and the Long Form Class Notice to each of

the 308,807 individuals so identified.  (*Id*., ¶ 21.)  In addition, the Settlement Administrator sent

notice by email to 34,256 unique individuals identified through the reverse lookup process

---

[2] Due to invalid addresses, approximately 60,000 of the mailed Notices and approximately 4,200
of the emailed Notices were undeliverable as originally addressed.  The Settlement
Administrator has also mailed Notice to approximately 38,600 updated addresses for the
undeliverable Notices. (Ex. B., ¶¶ 22-24.)

undertaken by Bill Me Later to identify additional phone numbers of individuals whose phone numbers were invalidated by Bill Me Later and subsequently called. (*Id.*, ¶ 22.)

## B. The Settlement Fund

The Settlement establishes a $9,900,000.00 cash settlement fund. Each authorized claimant is entitled to an equal share of the Settlement Fund, up to the full $500 statutory amount available under the TCPA, after payments are first made for notice and administration costs (approximately $925,000), Court-approved attorneys' fees (up to $3.3 million) and expenses, and Court-approved incentive payments to Plaintiffs (up to $30,000 each). Each Settlement Class Member may submit only one claim. (Ex. A. § 3.6.)

The total payment to each Settlement Class Member will depend on the number of valid Claim Forms submitted. Although the period to file claims remains open, Settlement Class Members have submitted 41,865 claims to date. Assuming the validity of all such claims and the full payment of the administrative fees, attorneys' fees and expenses and Incentive Awards, the recovery for each valid claim will exceed $135.00, well within the original estimate of the Settlement Administrator and within the range specifically identified in the Class Notice. Because the number of claims already made will easily exhaust the Settlement Fund, Class Counsel expect that the entire Distributable Settlement Fund will be distributed to Settlement Class Members, and none of the Settlement Fund will be distributed to *cy pres* recipients.[3]

Although not a formal term of the Settlement, this case has also resulted in significant non-monetary relief to the Settlement Class and the public. Shortly after the filing of the Complaint in this matter, Bill Me Later revised its internal policies relating to invalidation of phone numbers to

---

[3] In the event that any checks distributed by the Settlement Administrator to the Settlement Class Members are uncashed for a period of longer than 180 days, the Parties may request the Court's assistance in determining an appropriate *cy pres* recipient for such funds. (*See* Ex. A, ¶ 3.3.)

be called. Whereas Bill Me Later previously followed what is known as a "three strikes" policy – *i.e.*, it would often continue placing automated calls to a phone number until the third time the called party indicated it was calling the wrong number – it has changed that policy to a "one-strike" policy – meaning that it discontinues placing automated calls, or calls featuring a prerecorded or artificial voice, to a telephone number the first time that a called party indicates that Bill Me Later has called the wrong number. Bill Me Later's internal documents produced in discovery demonstrate that the reason for the change, which has already resulted and will continue to result in fewer unauthorized automated calls to non-Bill Me Later customers, was the filing of this lawsuit and the prevention of such suits in the future.

### C. Notice and Settlement Administration

As noted above, the Settlement Class Members are consumers who received automated calls, or calls featuring a prerecorded or artificial voice, to their residential or cellular phones from or on behalf of Bill Me Later between June 15, 2008 and the date of Preliminary Approval of the Settlement Agreement, and who did not give Bill Me Later consent to receive such calls.

Because most Settlement Class Members were not Bill Me Later customers, Bill Me Later did not have accurate identifying information for most members of the Settlement Class. As a result, for purposes of notice, the Settlement Class is comprised of two categories of members: "Direct Notice Consumers" who received unauthorized debt-collection robocalls from Bill Me Later and whose names and addresses can be obtained through "reverse lookup" procedures; and "Publication Notice Consumers" who received unauthorized debt-collection robocalls from Bill Me Later but for whom the Parties do not have specific identifying information and have no way of determining their identities in order to send them direct notice. (*See* Ex. A, § 2.7.)

Direct Notice Consumers were identified through a "reverse lookup procedure." A reverse lookup entails utilizing comprehensive and extensive databases of information from telephone

carriers to determine subscriber information affiliated with a telephone number at a given point in time. The procedure began with Bill Me Later providing the Settlement Administrator a list of all phone numbers to which Bill Me Later placed robocalls in the period from June 15, 2008 through the date of Preliminary Approval. (Ex. B., ¶ 20.) The Settlement Administrator then performed a reverse lookup of every number on that list, which determined the name of the individual who subscribed to that telephone number as of the date when Bill Me Later placed robocalls to that number. (*Id.*) The results of that reverse lookup were compared against Bill Me Later's customer account records, and all records for which the surname from the reverse lookup results did not match the surname from Bill Me Later's customer account records were considered Direct Notice Consumers who were provided notice through First Class Mail. Direct Notice was provided to 308,807 individuals. (Ex. B., ¶ 20.) Settlement Class Members whose mailed notice was returned as undeliverable were run through the U.S. Post Office's National Change of Address to identify a current address, and Direct Notice was mailed again to 37,517 such Settlement Class Members, and to an additional 1,136 Settlement Class Members who had forwarding addresses. (*Id.*, ¶¶ 23-34.) Publication Notice Consumers received publication notice through the extensive notice plan developed by the Settlement Administrator. (*Id.*, ¶¶ 26-30.)

The direct notice plan was supplemented with a robust publication notice plan. Combined, the notice plan reached an estimated 95% of all Settlement Class Members. (Ex. B., ¶ 33.) The publication notice plan was disseminated over a variety of media, selected to target the Publication Notice Consumers specifically. The publication notice plan placed ads in two popular magazines of general interest – *Sports Illustrated* and *People* –with a total of three insertions. (*Id.*, ¶ 27.) The plan also targeted consumers through internet banners on popular websites, through advertisements and the establishment of a Facebook page, and through the placement of

advertisements on a separate network of smartphone and tablet-based content providers. The internet banner ads reached an estimated 37% of U.S. adults who own cellular phones. (*Id.*, ¶ 28.) Potential Class Members could click on the advertisement, which linked to the settlement website.

Finally, the notice plan established a settlement website – www.autophonecallssettlement.com – with downloadable case documents and claim forms, allowing consumers to input their telephone numbers and other identifying information to determine eligibility for settlement benefits, and to file claims or opt-out of the Settlement online. (*Id.*, ¶ 30.) The website includes a list of anticipated "frequently asked questions" with responses, and other pertinent case information. Over 40,000 consumers have visited the website since September 22, 2014 (statistics prior to that date are unavailable), and, to date, over 29,000 claims – the majority of claims – have been submitted through the website. (*Id.*)

### D. Opt-Out and Objection Procedures

Settlement Class Members were given ample opportunity to object or exclude themselves from the Settlement. The procedures and deadlines for filing opt-out requests and objections were referenced in the Publication Notice and conspicuously listed in the Long Form Notices and on the settlement website. (Ex. B., ¶ 30.) With regard to objections, the notices informed Settlement Class Members that the Final Approval Hearing would be their opportunity to appear and to have their objections heard. (*Id.*) The notices also informed Settlement Class Members that they would be bound by the release unless they timely exercised their opt-out right. (*Id.*, Exs. B-D.) As discussed above, not a single Settlement Class Member objected to the Settlement or voiced any opposition, and only 33 consumers opted out of the Settlement. (*Id.*, ¶ 32.)

### E. Release

In exchange for the relief described above, Bill Me Later, its agent CSG International, and the banks involved in the Bill Me Later program, CIT Bank, WebBank and Comenity Capital

Bank, will receive from the above-defined Class a full release of all claims related to the allegedly-improper phone calls described in the Complaint, which includes a release of any claims under the TCPA or any state laws relating to unauthorized phone calls, and any other statutory or common law claim that could have been asserted based upon the same conduct. (*See* Ex. A, ¶¶ 1.35, 1.36, 5.1 for a description of the complete release language.)

## IV. THE SETTLEMENT WARRANTS FINAL APPROVAL

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) (*citing E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888-89 (7th Cir. 1985)). The Seventh Circuit has found that a District Court's inquiry as to whether to grant approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002) (*citing Isby*, 75 F.3d at 1198-99). This settlement easily meets that standard.

Because the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory, given that parties to a settlement "benefit by immediately resolving the litigation and receiving some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory." *In re AT&T Mobility Wireless Data Services Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (internal quotations and citations omitted). The requirement that a settlement be fair is designed to protect against collusion among the parties. *Mars Steel Corp. v. Cont'l Ill. Nat'l. Bank & Trust Co. of Chicago*, 834 F. 2d 677, 684 (7th Cir. 1987) (approving settlement upon a finding of no "hanky-panky" in negotiations). There is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed.), § 11.42. The lengthy duration of the litigation; the extensive and sometimes contentious investigation and discovery process; the multiple months of highly

contested settlement negotiations; the excellent result for the settlement Class in spite of the significant procedural and substantive hurdles faced by the Class Representatives; and the participation of an experienced mediator throughout the negotiation process are all testament to the non-collusive nature of the proposed Settlement.

The factors ultimately to be considered by the Court in assessing final approval are: (1) the strength of the plaintiff's case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted) (citing *Isby,* 75 F.3d at 1199). Of these considerations, the first is most important. *Synfuel Techs., Inc*., 463 F.3d at 653.

Application of the *Synfuel* factors to this case demonstrates that the Settlement is "fair, reasonable, and adequate." The Settlement provides significant benefits to the Settlement Class, as every Settlement Class Member has been able to make a claim for up to $500 from the Settlement Fund – the full amount of statutory damages available under the TCPA. The Class Representatives believe their TCPA claim against Bill Me Later is strong, but are also aware that Defendant has denied the material allegations of the Complaint and has raised several legal defenses, any of which, if successful, would result in the Class Representatives and the proposed Settlement Class Members receiving no payment whatsoever. Furthermore, Bill Me Later has taken the position consistently throughout this litigation that the Class Representatives would be unable to certify the class due the complex nature of its debt collection call procedures involving millions of customers and non-customers and dozens of call response "codes." Consequently, Bill

Me Later's defenses to a potential class certification motion could have resulted in the Settlement Class receiving no payment even if Misty Murray and Shaun Murray were to prevail on their individual claims. Taking these realities into account, and recognizing the risks involved in any litigation, the settlement relief represents an extraordinary result for the Settlement Class.

## A. All Factors Favor Final Approval

### i. The Settlement Provides Significant Benefits to the Settlement Class, Particularly Given the Uncertain Outcome of a Litigated Resolution.

In evaluating the fairness of a proposed class action settlement, and as discussed in more detail below, the most important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement. *Am. Int'l Grp., Inc. et al., v. ACE INA Holdings, et al.,* Nos. 07-cv-2898, 09 C 2026, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012). *See Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of the litigation.") In considering the strength of a plaintiff's case, the Court should quantify "the net expected value of continued litigation to the class," by estimating "the range of possible outcomes." *In re AT&T Mobility*, 270 F.R.D. at 346-47 (internal citations omitted); *accord Synfuel Techs, Inc.*, 463 F.3d at 653. In weighing this factor, the Court "should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). Finally, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (internal quotations omitted).

The TCPA provides for $500 in damages for each violation.  *See* 47 U.S.C. § 227(b)(3)(B).  A growing body of precedent indicates that the Class Representatives would ultimately succeed in both adversarial class certification and trial.  *See e.g. In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830 (2012)*, Agne v. Papa John's Int'l, Inc.*, C10-1139-JCC, 2012 WL 5473719 (W.D. Wash. Nov. 9, 2012) (certifying both a national and state subclass in TCPA text message action); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011); *but see Smith v. Microsoft Corp.*, 297 F.R.D. 464 (S.D. Cal. 2014) (denying class certification in TCPA case due to lack of evidence of consent).

While the Class Representatives believe they would secure class certification and prevail on the merits at trial, success would in no way be assured, as Bill Me Later has vigorously defended this case at every turn.  In the absence of settlement, the Class Representatives are cognizant that the "range of possible outcomes" certainly includes a number of unfavorable outcomes. (*See* Declaration of Evan M. Meyers, attached hereto as **Exhibit D**, ¶¶ 16-19.)  Defendant is represented by highly skilled counsel, and continued litigation could result in a finding from this Court or the Seventh Circuit that the phone calls did not run afoul of the TCPA, or that the proposed class was inappropriate for certification, either of which would result in no relief to the Class.  Further, Defendant raised several affirmative defenses and presented several potential factual hurdles during mediation, any of which, if successful, could result in no relief to the class.  (Ex. D, ¶ 16.)

Bill Me Later has repeatedly indicated to Class Counsel and the Court that it would contest many aspects of the case on the merits, contending that the equipment used to make the calls does not fall under the statutory definition of an "automatic telephone dialing machine" because the equipment did not constitute a predictive dialer (*see* Answer, ¶19), and more importantly, that it would contest class certification, contending that the Class Representatives would be unable to

adequately define a contested class based on the phone records it provided. Even if a contested class could be certified, the necessity of defining a contested class might result in a much smaller contested class than that certified in this Settlement.

Given the complexity of the issues still to be litigated and the very real potential that Defendant could succeed on any of the above-referenced issues on either a motion for class certification, motion for summary judgment or at trial – depriving the Plaintiffs and Class of any relief whatsoever – the instant Settlement was an appropriate alternative. Although the Class Representatives and Class Counsel believe that their TCPA claims are strong, given the potential for unfavorable outcomes in the case, the significant amount of beneficial relief to each Class Member submitting a claim weighs heavily in favor of granting final approval of the Settlement. *See Lipuma*, 406 F. Supp. 2d at 1323 ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush.") Weighing the strength of the Class Representatives' claims and potential risks involved with continued litigation, against the exceptional results for the Settlement Class provided by the Agreement, this first factor strongly supports final approval of the Settlement. The Settlement Fund created here, which provides Settlement Class Members the ability to claim up to the full statutory amount of $500, coupled with the changes to Bill Me Later's collection activities already implemented in response to this class action suit, meets and exceeds the applicable standards of fairness and is substantially consistent with other TCPA settlements that have been approved in this District and throughout the country. Thus, given the strength of the Class Representatives' claims, the Court should find this factor satisfied.

> ii. *This Multi-Year Litigation has Already Involved Complex and Expensive Discovery on Novel and Uncertain Legal Issues.*

Final approval of a settlement is favored where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time."

*In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000) (finding that settlement is favored where further litigation would require additional written discovery, depositions and expert discovery, and where appellate practice is likely to result); *accord Isby,* 75 F.3d at 1199. Continued litigation in this case would most certainly result in an increase in the complexity of the issues to be resolved, the duration of the lawsuit, and an increase in the expenses incurred by both parties. (Ex. D., ¶18.)

Similar to the risk inherent in pursuing the merits of the case, is the risk of certifying and then maintaining class status throughout the litigation. This risk is not exclusive to instances where a plaintiff has already managed to successfully move for class certification prior to settlement. In fact, courts will still consider this factor even where a settlement is reached prior to class certification, given that pre-certification concerns validate the risk both parties faced should a plaintiff succeed or fail in certifying the class. *See Gardner v. GC Services, LP,* No. 10-CV-0997-IEG CAB, 2012 WL 1119534, *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk class certification poses for both parties and acknowledging the benefits of settlement prior thereto).

In light of such complexity and the amount of potential damages at issue, the defeated party would likely appeal, further delaying any resolution. (Ex. D, ¶ 18.) The Parties would incur significant additional expenses if the Settlement is not approved, including the costs of further discovery, the retention of expert witnesses, the filing and defending of further pre-trial motions, including class certification briefing, and the great expense of conducting a class action trial. Evidence and witnesses from across the country would have to be convened, adding additional expense to the litigation. (*Id*.) Thus, this factor weighs in favor of approving the Settlement.

iii. *The Unqualified Support of the Settlement Class Demonstrates the Benefit of the Settlement and Supports Final Approval.*

Class Members have shown substantial interest in the settlement, with absolutely no opposition. Direct notice was given to approximately 342,000 Settlement Class Members, and publication notice exposed millions of additional persons to the notice program. (*See* Ex. B.) Over 41,000 Settlement Class Members have filed claim forms, with over a month remaining before the claims filing deadline. (Ex. C, ¶ 16.) By contrast, not a single Settlement Class Member filed any formal objection to the Settlement, nor expressed any complaints to Class Counsel regarding the Settlement or the Fee Motion. (Ex. C, ¶ 17.) And despite the significant awareness of, and interest in, the Settlement, only 33 Settlement Class Members filed exclusions from the Settlement Class. (Ex. B, ¶3 2.) With a claims-to-exclusions ratio exceeding 1,000:1 (and with no objections), the Settlement Class Members have spoken, and they overwhelmingly support this Settlement.

The lack of objectors challenging the settlement favors a finding that the settlement is "fair and reasonable." *Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F. Supp. 2d 816, 819 (N.D. Ill. 2002). The fact that not one Class Member filed an objection to the settlement, is "strong circumstantial evidence favoring settlement." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020-21. Here, not one person has objected to the Settlement and only 33 requests for exclusion from the Agreement were received. The lack of objections, combined with the miniscule percentage of exclusions, strongly supports the conclusion that the settlement is fair and reasonable. *Newberg*, § 11.41; *see also Hammon v. Barry*, 752 F. Supp. 1087, 1092 (D.D.C. 1990) (85 objections to a settlement involving about 2,000 individuals constitutes "low level of dissatisfaction"); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir. 1974) (settlement approved with 20% of class objecting), *cert. denied,* 419 U.S. 900 (1974); *Laskey v.*

*International Union (UAW),* 638 F.2d 954, 956 (6th Cir.1981) (settlement fair and reasonable when only 7 objections were filed out of 109 noticed class members).

In addition, Defendant provided notice of the Settlement to the appropriate state and federal officials pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, and no comments or opposition from those governmental entities was received. (*See* Notice of CAFA Compliance, Dkt. 72; Ex. D, ¶ 14.) "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner v. State Farm Mut. Auto. Ins. Co.*, CV-08-1365, 2010 WL 1687832, *14 (N.D. Cal. Apr. 22, 2010).

Additionally, attorneys and staff at McGuire Law, P.C. and at McMorrow Law, P.C. spoke with hundreds of Class Members about the Settlement in exercise of their fiduciary duties to the Class. (Ex. C, ¶ 17; Ex. D ¶ 8.) Several thousand more calls were received by the Settlement Administrator through the phone numbers listed in the forms of notice. (Ex. B, ¶ 31.) Notably, none of the Class Members with whom Class Counsel spoke objected to the terms of the Settlement, and hundreds verbally expressed approval of the terms of the Settlement and indicated that they would submit claim forms in this case. (Ex. D, ¶ 8; Ex. C, ¶ 17.) This lack of opposition further supports granting final approval of the Settlement.

      *iv.*      *Experienced Class Counsel Believes the Settlement is Fair, Reasonable and Adequate.*

Courts are entitled to rely on the opinion of competent Class Counsel that the settlement is fair, reasonable and adequate. *See Isby*, 75 F.3d at 1200; *see also Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997) (noting a "strong initial presumption of fairness attaches" where settlement is "the result of arm's length negotiations," and where counsel

are "experienced and have engaged in adequate discovery.") Counsel, all of whom are experienced in litigating class actions, and TCPA cases in particular, have expressed their support for the Settlement. (*See* Dkts. 69-2, 69-3 (declarations in support of Mot. for Prelim. Approval.)

Furthermore, the Settlement Agreement was finalized only after extensive arm's length negotiations in a formal mediation with Judge Infante and only after the Class Representatives obtained access to sufficient informal discovery to fairly and effectively negotiate a settlement on behalf of the Settlement Class. (Ex. D, ¶¶ 7-10.) Faced with the prospect of receiving nothing should Defendant succeed in any aspect of what assuredly would have been a vigorous defense absent settlement, Class Counsel are confident that payment of up to $500 per class member is an exceptional result in this litigation. (*See* Ex. D, ¶¶ 17-19; Ex. C, ¶18.)

In sum, the Settlement is the product of extensive, adversarial negotiations between counsel for both Parties experienced in class actions and consumer fraud litigation. As discussed above, the Settlement provides the Class with significant equitable and monetary relief, particularly in light of the risk of little or no recovery, and in light of the certainty of additional costs, expenses, risk and delay if litigation were to continue. Thus, in counsel's view, the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class Members.

*v.*      *The Extensive Discovery and Advanced Stage of the Proceedings Weigh in Favor of Approval.*

"Approval of a settlement is proper where discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough." *Isby*, 75 F.3d at 1200; *accord Mangone v. First USA Bank*, 206 F.R.D. 222, 226 (S.D. Ill. 2001). The Class Representatives engaged in significant discovery, including depositions and the review of thousands of pages of documents, which allowed Class Counsel to determine the relationships between Bill Me Later, its financial partners, and its third-party vendors and calling companies.

That discovery allowed the Class Representatives to put forth a strong position for class certification against Bill Me Later, in addition to a strong position on the merits of the claim.

The Parties also put the strengths of their opposing positions to the test at extensive settlement negotiations and in preparation for discovery motion practice before this Court, which was avoided only through the settlement negotiations. Settlement discussions only commenced after significant investigation into the Class Representatives' claims and class certification issues. (Ex. D, ¶¶ 7-8.) Accordingly, the final factor weighs in favor of approval, and each of the five *Synfuel* factors supports a finding that the Settlement is fair, reasonable, and adequate, making final approval of the Settlement fully warranted.

Finally, the fairness, reasonableness, and adequacy of the instant Settlement is further supported by the recent approval of similar class action settlements by this Court. *See, e.g., Desai et al v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill. 2013) (approving settlement creating a $15 million fund for unauthorized robocalls to 1.4 million class members, resulting in a settlement payment of approximately $50-100 per class member); *Rojas et al v. Career Education Corp.*, No. 10-cv-05260 (N.D. Ill. 2012) (approving settlement creating a $20 million settlement fund for the transmission of 99,000 text messages entitling each class member to a $200 settlement payment); *Lozano et al v. Twentieth Century Fox Film Corp.* 09-cv-06344 (N.D. Ill. 2011) (approving settlement creating a $16 million settlement fund for the transmission of 98,000 text messages entitling each class member to a $200 settlement payment). Accordingly, the Settlement, which creates a $9.9 million Settlement Fund – which is non-reversionary and will be fully paid out – where each recipient of the allegedly unauthorized calls from or on behalf of Bill Me Later can submit a claim for up to $500 from the Settlement Fund, subject to *pro rata* reduction, is equally fair, reasonable, and adequate, and warrants Court approval.

## B. The Executed Notice Program Comports with Due Process and the Requirements of Fed R. Civ. P. 23

Before the Court may grant final approval of the Settlement, Fed. R. Civ. P. 23(c)(2) requires that the Court determine that the Settlement provided the class with the "best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Notice is satisfactory where it describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard. *See Newberg*, § 11:53 at 167 (4th ed. 2002) (notice is "adequate if it may be understood by the average class member.") Adequate notice sets forth the nature of the action, defines the class to be certified, the class claims and defenses at issue, while also explaining to class members that they may enter an appearance through counsel if so desired, request exclusion from the settlement class, and that any judgment will be binding on all class members. *See* Fed. R. Civ. P. 23 (c)(2)(B). "Neither Rule 23 nor due process require 'receipt of actual notice by all class members;' rather, 'notice should be mailed to the last known addresses of those who can be identified and publication used to notify the others.'" *Mangone*, 206 F.R.D. at 231-32 (internal citations omitted); *see also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification.") The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, p. 3 (2010). The Settlement Administrator and the Parties have strictly adhered to these requirements in directing notice to Class Members.

The Settlement Administrator provided notice to the Settlement Class Members as directed by this Court in the Preliminary Approval Order. (Ex. B, ¶¶ 6, 18-31.; Dkt. 71, ¶¶ 7-10.) That

notice provided "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified with reasonable effort." Fed. R. Civ. P. 23(c)(2); s*ee also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Notice was directly mailed to all potential Settlement Class Members for whom addresses could be located through the reverse-lookup process described in the Motion for Preliminary Approval and approved by this Court in the Preliminary Approval Order, and notice was also e-mailed to additional potential Settlement Class Members for whom valid e-mail addresses were available.

Direct Notice of the Settlement was provided by First Class Mail to 308,807 Settlement Class Members. Prior to mailing, each address was checked against the National Change of Address database, and recognized procedures were used to ensure accurate addressing and valid delivery. (Ex. B, ¶ 21.) For all undeliverable Notices , the Settlement Administrator performed an additional search and obtained valid address through a LexisNexis database and re-mailed over 38,000 Notices. (Ex. B, ¶¶ 23-24.) In addition, Direct Notice was provided by e-mail to an additional 34,256 potential Settlement Class Members. (*Id*., ¶ 22.) Direct Notice was provided by mail to over 92% of the Class for whom addresses were available. (*See Id*., ¶¶ 21-24.)

All forms of notice referenced the settlement website, www.autophonecallssettlement.com, which went live on August 22, 2014, and provided contact numbers for Class Counsel and the Settlement Administrator. (*Id*. ¶ 30.) The website contains the full traditional "long form" notice of the Settlement, as well as copies of relevant Court documents including the Settlement Agreement, Orders of the Court, and the Motion for Approval of Attorneys' Fees, Expenses & Incentive Awards. (*Id*.) The website allows Settlement Class Members to make claims online, allows Settlement Class Members to object or opt-out of the Settlement, and provides toll free numbers for Class Counsel and the Settlement Administrator. (*Id*., ¶¶ 30-31.)

In addition, notice was published in two of the most popular magazines in the nation, with a combined readership of over 60 million, notice was posted on popular websites, and a Facebook page was created with information about the action and claim forms. (Ex. B, ¶¶ 27-29); *see Mirfasihi v. Fleet Mortg. Corp.,* 356 F.3d 781, 786 (7th Cir. 2004) (Rule 23(b)(3) class) ("When individual notice is infeasible, notice by publication in a newspaper of national circulation … is an acceptable substitute"); *see also Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,* 271 F.R.D. 139, 146 (N.D. Ill. 2010) ("[T]he court is satisfied that notice by publication may be sufficient when individual class members cannot be identified.") The notice scheme included, *inter alia*, a description of the action and the claims, the definition of the class, and an explanation of how to appear and object and how to request an exclusion—all meeting Rule 23's requirements.

Finally, as discussed above, on August 1, 2014, in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715(b), Defendant's counsel mailed a letter enclosing the requisite court documents to the U.S. Attorney General and the Attorneys General of each state and U.S. territory giving notice of the Settlement. (*See* Defendant's Notice of CAFA Compliance, Dkt. 72.)

Given its content and scope, as well as the percentage of Settlement Class Members successfully reached, the Notice Plan fully satisfies Rule 23 and Due Process. (*See* Ex. B, ¶¶ 33.)

## V. THE UNOPPOSED ATTORNEY FEE AND INCENTIVE AWARDS SHOULD BE APPROVED

Each form of notice in this matter informed Settlement Class Members of the amount of attorneys' fees, expenses and Incentive Awards that would be requested in this Settlement. In addition, the Class Representatives and Class Counsel filed their Motion for Approval of Attorneys' Fees, Expenses & Incentive Awards ("Fee Motion") (Dkt. 75) on October 6, 2014, seventeen days before the October 23 deadline for objections and opt-outs. The Settlement Administrator posted the Fee Motion on the Settlement Website the following day. Posting the

Fee Motion on the Settlement Website more than two weeks prior to the opt-out and objection deadline gave Settlement Class Members ample opportunity to consider the merits of the Fee Motion and any concerns with the same.

The Settlement Class Members submitted no opposition to the Fee Motion or to the attorneys' fees, expenses and Incentive Awards requested therein. (Ex. C, ¶17.) No objections to the Settlement or to the Fee Motion were filed, and no correspondence from Settlement Class Members expressed dissatisfaction with the fees, expenses or Incentive Awards. (*Id.*) The lack of opposition is not surprising; as discussed above, this Settlement provides a tremendous cash benefit to the Settlement Class, and the pendency of this action has already changed the calling behavior of Bill Me Later in ways that benefit the Settlement Class and the public.

For the reasons stated in favor of the attorneys' fees, expenses and incentive awards in the Fee Motion, and because no opposition to that Fee Motion was submitted, the Class Representatives and Class Counsel respectfully request that this Court approve the fees, expenses and Incentive Awards for the reasons set forth in the Fee Motion.

## VI.    CONCLUSION

For the reasons stated above and in Plaintiff's Motion for Approval of Attorneys' Fees, Expenses & Incentive Awards, the Class Representatives respectfully request that this Court grant both motions in their entirety. A proposed Final Approval Order is attached as **Exhibit E**.

Dated: November 6, 2014                                   Respectfully submitted,


                                                     By: /s/  Michael J. McMorrow
                                                     One of Plaintiffs' Attorneys


Myles McGuire

24

mmcguire@mgpc.com
Evan M. Meyers
emeyers@mcgpc.com
McGUIRE LAW, P.C.
161 N. Clark Street, 47th Floor
Chicago, IL 60601
Tel: (312) 216-5179
Fax: 312-275-7895

Michael J. McMorrow
mike@mjmcmorrow.com
MCMORROW LAW, P.C.
One North LaSalle St., 44th Floor
Chicago, IL 60604
Tel:  (312) 265-0708

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on November 6, 2014, I caused the foregoing ***Plaintiff's Unopposed Motion and Memorandum in Support of Final Approval of Class Action Settlement*** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party:

        Mark B. Blocker
        mblocker@sidley.com
        Matthew Taskin
        mtaskin@sidley.com
        SIDLEY AUSTIN LLP
        One South Dearborn Street
        Chicago, IL 60603

                /s/  Michael J. McMorrow